**Ivar JEPSON, Appellant,**

**v.**

**William D. EGLY and Columbus W. Harris, Appellees (two cases).**

**Patent Appeals Nos. 6158, 6159.**

United States Court of Customs and Patent Appeals.

April 3, 1956.

Rehearing Denied May 10, 1956.

George R. Clark, Mason, Kolehmainen, Rathburn & Wyss, and Walther E. Wyss, Chicago, Ill. (George R. Jones, Washington, D. C., of counsel), for appellant.

Eugene C. Knoblock, South Bend, Ind., for appellees.

Before O'CONNELL, Acting Chief Judge, and JOHNSON, WORLEY, COLE and JACKSON, retired, Judges.

JOHNSON, Judge.

These are appeals by Ivar Jepson from the decision of the Board of Patent Interferences of the United States Patent Office awarding priority of invention to the joint parties William D. Egly and Columbus W. Harris in Interference Nos. 85,640 and 86,202.

Interference No. 85,640 (Appeal No. 6158) involves the Jepson application, Serial No. 107,653, filed July 30, 1949, and the Egly and Harris joint application, Serial No. 53,492, filed October 8, 1948. Interference No. 86,202 (Appeal No. 6159) involves the Jepson application, Serial No. 126,857, filed November 12, 1949, and the above-mentioned Egly and Harris joint application.

The proceedings below in both interferences have been consolidated into a single record because of the related nature of the subject matter. We will therefore treat both appeals in one opinion. However, for the sake of clarity, this opinion will treat each appeal under a separate heading.

Interference No. 85,640 (Appeal No. 6158).

The inventions in issue relate to travelling lawn sprinklers. Both parties to the interference broadly disclose a lawn sprinkler having a rotatable sprinkling head mounting a plurality of nozzles each of which sprays a stream of water. The lawn sprinkler is adapted to be attached to a flexible hose which supplies water thereto. The travelling sprinklers have structure thereon which is placed in contact with the flexible hose so that as the rotatable sprinkling head rotates because of water pressure, the travelling sprinkler is caused to pull itself along the hose and thus traverse the path defined by the hose.

One of the issues before us is whether the two counts involved in the interference read on one modification of the invention set forth in the Jepson application. In order to answer this question, we deem it expedient to briefly describe the pertinent structure disclosed in each of the applications, namely, the structure which causes the sprinkler to travel.

In the Egly-Harris disclosure, the rotatable sprinkling head is caused to rotate by the water under pressure which is supplied thereto. Two vertical shafts are journalled in the sprinkler housing. Gears transmit motion from the rotating head to *each* of these shafts. The shafts have rollers fixedly mounted on them. The rollers are adapted to clamp the hose between them, and as the shafts and the rollers rotate the sprinkler is pulled along the hose and thus is caused to travel.

Jepson discloses an embodiment of his invention which is similar to the Egly-Harris structure. However, it is different in the sense that only one shaft which mounts a hose gripping roller is positively driven through gearing connecting it to the rotatable sprinkling head. A second roller which is not positively driven co-acts with the positively driven roller to grip the hose therebetween. The second roller merely rotates idly as the sprinkler is pulled along the hose by traction between the positively driven roller and the hose.

The following two counts are in issue in this case:

> "1. A traveling lawn sprinkler comprising a housing adapted to be connected to a flexible water conduit, a water reactance sprinkler unit rotatably mounted by said housing, and rotatable drive members actuated by said unit and including a pair of rotatable members gripping said conduit therebetween to propel said housing.
>
> "2. A sprinkler of the rotary reaction type having nozzles revolving about a vertical axis comprising a support for rotatably supporting said nozzles, a pair of rotatable members associated with said support adapted to receive a water supply conduit therebetween, means for biasing said rotatable members to grip said conduit, and means responsive to rotation of said nozzles for rotating said members to cause said sprinkler to propel itself along said conduit by traction with said conduit."

The Board of Patent Interferences was of the opinion that the above-described Jepson structure did not read on the above counts. The reasons for the board's opinion can best be stated by directly quoting the following portion of the board's opinion:

> "In the modification shown in Figures 13 an [sic] 14, the 'pair of rotatable members' recited near the end of Count 1 can only be the pair of rollers 212 and 213. According to the count they must form a part of the 'drive members actuated by said unit' (the 'water reactance sprinkler unit') since the count refers to the 'drive members' as 'including' the 'pair of rotatable members'. In order for roller 213 to be connected to the other parts of the 'drive members' so that it will, with them, be 'actuated by said unit' it is necessary to include the hose 21 or the ground as part of the 'drive members'. However, the 'drive members' must be part of 'a travelling lawn sprinkler' since the count is drawn to such a sprinkler 'comprising-drive members'. Obviously the hose or the ground are not part of such a sprinkler, particularly since neither the ground nor the portion of hose between the rollers travels with the other parts of the sprinkler. Thus in attempting to apply count 1 to the sprinkler shown in Figures 13 and 14 one must use something external to the sprinkler itself. This is not necessary with respect to the devices shown in the other figures of Jepson's application or in his opponent's application.
>
> "* * * In addition, Count 1 describes the 'drive members' as 'rotatable', which is not true in any pertinent sense of the hose or the ground.
>
> "Similar considerations apply as to Count 2 relative to the type of device shown in Jepson's Figures 13 and 14 wherein the 'pair of rotatable members-adapted to receive a water supply conduit therebetween' are rollers 212 and 213. 'Means-for rotating said members' must include the hose (conduit) or ground for in their absence roller 213 will not be rotated; but neither the hose *or* ground is a part of the sprinkler, nor is either 'responsive to rotation of said nozzles'. Moreover, it seems inapt to say that roller 213 is rotated 'to cause said sprinkler to propel itself along said conduit' when it is

such relative movement of the sprinkler and hose that causes the freely rotatable roller 213 to rotate. We accordingly hold that the type of sprinkler shown in Figures 13 and 14 of Jepson and in his Exhibits 9 and 10 does not support either count."

The first question we must answer is whether the board was correct in its above holding. It is well settled that counts of an interference should be given the broadest interpretation which they will reasonably support, Tansel v. Higonnet, 215 F.2d 457, 42 C.C.P.A., Patents, 732, and the word *reasonably* should not be deleted, De Benneville v. Anderson, 212 F.2d 612, 41 C.C.P.A., Patents, 891. Furthermore, while, on one hand, limitations not included in the counts cannot be subsequently read into them, Tansel v. Higonnet, supra, on the other hand, limitations expressed in the counts may not be disregarded, Kropa v. Robie, 187 F.2d 150, 38 C.C.P.A., Patents, 858.

In the light of the foregoing law, we concur with the board's conclusion. Count 1 calls for "rotatable drive members actuated by said unit and including a pair of rotatable members gripping said conduit." In the Jepson structure there is only one rotatable drive member disclosed, namely, the shaft which drives one of the rollers. We are therefore of the opinion that to say the Jepson structure, which only discloses one "member," reads on the count, which calls for "members," would be to disregard a limitation expressed in the count and thus give the count an unreasonable interpretation. Relative to count 2, we are of the opinion that a reasonable interpretation thereof also dictates that it does not read on the Jepson structure. This count recites "a pair of rotatable members * * * adapted to receive a water supply conduit therebetween." This structure is the rollers which grip the hose. The count further recites "means responsive to rotation of said nozzles for rotating said members to cause said sprinkler to propel itself along said conduit by traction with said conduit." However, the Jepson sprinkler does not have "means for rotating said members;" it only has means for rotating one member. Therefore, to give count 2 an interpretation which would include the above-described Jepson structure would, in our opinion, be disregarding a limitation of the count which in turn would result in an unreasonable interpretation thereof. In view of the foregoing reasons, it is our belief that the above-described Jepson structure, which has only one driven member, does not read on counts 1 and 2.

It is to be noted that evidence was submitted on behalf of Jepson for proving that the above-described sprinkler having but one driven member was actually built before February 1948, prior to the filing of the Egly-Harris application on October 8, 1948. This evidence included Exhibits 11 and 12, which are photographs of the sprinkler having one driven member. However, since a sprinkler having only one driven member will not conform to the above counts, the question of when such a sprinkler was built is immaterial, and therefore need not be considered.

There is another embodiment in the above-mentioned Jepson application which was conceded by appellees to satisfy the counts. It is urged by appellant that this embodiment, Exhibit 24, was conceived, built and tested prior to October 8, 1948, the filing date of the Egly-Harris application. In this respect an actual sprinkler, Exhibit 24, was submitted in evidence. However, the board was of the opinion that Egly and Harris were the first to complete the invention because of their earlier constructive reduction to practice, and that Jepson had not established prior actual reduction to practice by adequate corroborating testimony.

In the present case, Jepson is the junior party. Since the junior party is relying on an actual reduction to practice in order to prove priority, he

must prove either an actual reduction to practice prior to the earliest date to which appellee may be entitled for actual or constructive reduction, Holslag v. Steinert, 143 F.2d 661, 31 C.C.P.A., Patents, 1116, or prior conception coupled with the exercise of reasonable diligence from just prior to the senior party's entry into the field to a later actual reduction to practice, Hull v. Davenport, 90 F.2d 103, 24 C.C.P.A., Patents, 1194. Furthermore, this being an interference between applicants, the junior party has the burden of proving priority of invention by a preponderance of the evidence. Clark v. Camras, 204 F.2d 273, 40 C.C.P.A., Patents, 963.

In the present case, the board found that there was not enough corroborating evidence to prove an actual reduction to practice by the appellant Jepson. There is no question of diligence involved here. Therefore, our opinion will treat the question of whether an actual prior reduction to practice by Jepson was proved in the manner required by law.

Appellant, Jepson, urges that he successfully reduced his sprinkler, which satisfies the counts, to practice prior to appellee's filing date. In addition to the actual sprinkler, Exhibit 24, appellant has submitted a layout drawing of Exhibit 24. The layout drawing is designated Exhibit 65, and is dated September 25, 1948. A photograph of Exhibit 24 was also submitted, and designated Exhibit 25. This photograph has a date "10–1–48" appearing therein on a card which is positioned in front of the sprinkler.

Jepson himself testified that Exhibit 24 was tested on Jepson's own lawn and on the roof of a building several times prior to October 1, 1948. In this respect, the following testimony was given by Mr. Jepson:

"Q. 284. Would you be able to recall about when this model was made or being made? A. I believe it was made in August or September of 1948.

*        *        *        *        *

"Q. 290. Mr. Jepson, I hand you herewith a photograph that has been marked for identification as Jepson Exhibit 25, and ask you whether this is a photograph of the model which has been marked for identification as Jepson Exhibit 24? A. Yes, it is a photograph of the Exhibit 24, and this photograph was taken on October 1, 1948.

"Q. 291. Does that mean, then, Mr. Jepson, that the model, Exhibit 24 was built sometime before October, 1948? Was it in complete form by that time? A. That is correct.

*        *        *        *        *        *

"Q. 294. Mr. Jepson, would you refer to Jepson Exhibit 5–B and determine whether any of your model makers spent time somewhat prior to October, 1948, which would indicate that they were working on this model, Jepson Exhibit 24? A. Yes, I find one model maker, Mr. Sigman. That I know definitely. He worked on the model that is shown as Exhibit 24. His time record shows that he worked on the walking sprinkler from 8–29–48 until 10–10–48.

"Q. 295. And you know for a fact that he did some work on this travelling sprinkler? A. I know definitely because I worked with him when he made it and I helped him out several times on problems that he had with it.

*        *        *        *        *        *

"Q. 298. Would you say, therefore, that tests were made on this model before October 1, 1948? A. Yes, it must have been, because we didn't put the rubber on until a little later.

"Q. 299. Where did you test this model, Jepson Exhibit 24? A. Well, we tested it up on the roof of the Development Building, and I had it home on my own lawn several times to find out how it worked."

Two things are evident from the foregoing quoted testimony. The first is

that there is no statement therein by Jepson just who the "we" were who tested the model on the roof of the development building, and whether any one saw Mr. Jepson test it on his own lawn. [See question 299, supra.] The second is that while Mr. Jepson testified that the photograph, Exhibit 25, was taken on October 1, 1948, and that Exhibit 24 was complete by that time, Mr. Jepson also testified that one model maker worked on a walking sprinkler from "8–29–48 until 10–10–48." According to the phraseology used in answering question 294, supra, it appears that the walking sprinkler referred to is Exhibit 24. On cross examination, the following testimony was obtained from Mr. Jepson:

> "XQ. 483. Now, referring to Exhibit 25, have you any way, except for the date which appears upon it, for establishing the date on which that photograph was taken? A. I can tie that date up with some model work that was done on this model by looking at the time cards.
>
> "XQ. 484. Exhibit 5–B? A. I can see, from this card, that the model maker, Mr. Sigman spend [sic] some time on the model from August 29, 1948 until October 10, 1948. He evidently made some corrections on the model after the photograph was taken, because the photograph was taken nine days before this last date appears."

One portion of Jepson's testimony is to the effect that Exhibit 24 was complete on "10–1–48," the date given in the photograph. However, Jepson's statement that "He evidently made some corrections on the model after the photograph was taken, * * *" seems to detract from the conclusiveness of the date of completion. However, we do not base any of our conclusions directly on the discrepancy of the foregoing dates, but on the well settled law.

■■ It has uniformly been held in interference matters that the claim of an *applicant* that the subject matter in issue was fully completed, tested, and operated prior to the date of filing requiries corroboration in order to succeed. Janette v. Folds (Persons), 38 F.2d 361, 17 C.C.P.A., Patents, 879. Jira v. Weber, 201 F.2d 914, 40 C.C.P.A., Patents, 762. Regardless of the high character of an inventor and the persuasiveness of the testimony, the court is bound by the well established rule of patent law that independent corroboration of the testimony of an inventor is essential to establish actual reduction to practice of an invention, and that reports, official or otherwise, which are self serving statements cannot be considered as corroborative evidence of such reduction to practice. Crane v. Carlson, 125 F.2d 709, 29 C.C.P.A., Patents, 879.

The foregoing law, in our opinion, is determinative of the weight to be given appellant Jepson's testimony. It is to be noted from Jepson's testimony that no one was mentioned therein who saw Mr. Jepson perform the tests on his lawn. Furthermore, there is no statement in the testimony who the people referred to as "we" were who made the tests on the roof. Thus there have been no statements made as to who could corroborate Mr. Jepson's testimony. Furthermore, the photograph, Exhibit 25, is not only self serving for the purpose of showing that the device was built by "10–1–48," but neither does it corroborate that it was successfully tested by this date. In short, therefore, there has been no testimony given or evidence presented up to this point which would corroborate Jepson's testimony.

However, there is testimony in the record which was given by associates of Jepson which must be reviewed to determine whether it sufficiently corroborates that Exhibit 24 was reduced to practice. The first of these witnesses is Mr. Kukulski, a development engineer who worked with Mr. Jepson. His testimony is in part as follows:

> "Q. 378. Do you remember doing any testing of the Jepson Exhibit 24? A. Yes, I tested it myself.

"Q. 379. Where did you test it? A. This job here we tested across the street from our plant. There is a school, a high school stadium, a football field at the northeast corner of Central and Roosevelt and they have a large spot of grass there and we tested this unit out there, right out on the grass.

"Q. 380. Where do you get the water out there? A. From a hydrant, from a regular fire hydrant. We obtained permission from the caretaker of the grounds there, and we have an adapter that fits the hydrant. This adapter is a reducer and contains a pressure *guage* and a valve and things of that nature.

"Q. 381. Did you do this alone? A. I did that with Mr. Lane.

"Q. 382. When did you do this? A. Oh, I would say, that was in the Fall of 1948. I would say about October. It was rather cool. I remember the weather was nice.

* * * * * *

"Q. 389. Mr. Kukulski, I hand you herewith a photograph which has been introduced in evidence as Jepson Exhibit 25. Do you recognize this? A. That is a photograph of this unit Exhibit 24.

"Q. 390. Do you remember when it was taken? A. The date here is October 1, 1948.

"Q. 391. You assisted in taking the photographs, Jepson Exhibits 11 and 12. Did you on this one? A. I did on that too, yes, sir.

"Q. 392. And was it taken on October 1, 1948? A. That is right.

"Q. 393. When you tested this sprinkler on the lawn across from the Sunbeam plant, was it like this model or was it like the photograph? A. Of Jepson Exhibit 25 and the model of Exhibit 24, no. It was like the model. I noticed on the photograph they have a rubber facing here. Mr. Ottosen put that sponge rubber facing on the inside of the wheels. He was conducting some sort of a test. That is the only difference.

"Q. 394. Did you ever see any tests made while the rubber was on there? A. Yes, I saw them making a test in the lab.

"Q. 395. When was that made, before or after your tests? A. That was done after, I think. It may have been before. I am not absolutely sure on that."

On cross examination, Mr. Kukulski testified as follows:

"XQ. 639. Now you said that you made some tests on the Exhibit 24 device on the high school football field across the street from your plant? A. Correct.

"XQ. 640. You said that it was in the Fall of 1948? A. That is right.

"XQ. 641. Can you come any closer than that to setting the date of those tests? A. We could ascertain it rather closely from the drawings.

"Mr. Knoblock: Could I have the drawings on the wheels?

"Mr. Wyss: We don't have the drawings on the wheels. This is the only drawing.

"The Witness: Just about this time, September 25th, I would say, somewhere the beginning of October.

"XQ. 642. You mean the beginning of November? A. I can't remember that close now. I would say it was shortly after this layout.

"XQ. 643. Could it have been the following Spring? A. No. Shortly after this."

It is our opinion that the foregoing testimony does not clearly show that the device was successfully tested prior to ap-

pellees' filing date of October 8, 1948. Furthermore, appellant has neither argued nor made a showing of diligence from a time immediately preceding appellees' entry into the field to a subsequent reduction to practice as required by the rule stated in Hull v. Davenport, supra. Therefore, this aspect of interference law is not before us. However, our analysis of the testimony of Kukulski, both cross and direct, does not definitely show that Exhibit 24 was adequately tested prior to appellees' filing date, nor are there sufficient facts given which would lead to such a conclusion. We are therefore of the opinion the Kukulski's testimony does not adequately corroborate Jepson's testimony.

Mr. Ottosen, head of the Model Shop wherein Exhibit 24 was made, testified as follows:

> "Q. 115. When did you build the sprinkler, Jepson Exhibit 24? When would you say that you completed it? A. That would be the same year, 1948.
>
> "Q. 116. Would you be able to tell what part of the year it was? A. Yes. It was early summer.
>
> "Q. 117. Early summer of 1948? A. Yes, because immediately after we made that one, we found that we didn't get quite enough traction—I mean pull—as we wanted. We always like to have double of what we need. At the same time, we knew by driving with two wheels we would get more traction than we would with one. That is why we went and designed this with the double drive.
>
> "Q. 118. Did you see that sprinkler that you built, Mr. Ottosen, which is Jepson Exhibit 24, tested or did you test it yourself? A. I tested it and when it was tested it was on the roof. That we run on the roof.
>
> "Q. 119. Do you happen to know of your own knowledge whether it was tested on any lawns? A. We did test it across the street.
>
> "Q. 120. By across the street you mean— A. Across from the plant there is a parkway owned by the Board of Education.
>
> "Q. 121. Did you see it tested there? A. I saw it tested there.
>
> "Q. 122. Would you be able to tell about when that was? A. That was in the summer of 1948."

The board summarized part of Ottosen's testimony as follows:

> "The layout above referred to is Exhibit 65, which was finished September 25, 1948 (page 180 Qs. 361, 362). Jepson says after he conceived the idea he 'at first' asked Kukulski to make a layout and 'later on' authorized the model shop to building up makers just worked from the layout (page 65 Q. 281; page 66 Q. 283). Ottosen nevertheless says he never saw the layout before he built Exhibit 24 (page 241 Q. 102A). Since this testimony is in conflict with that of other witnesses it would appear to be in error particularly as to the date, since the testimony of the others conforms to contemporaneous records. * * *"

We feel, as did the board, that Ottosen's testimony is in conflict with other of the testimony which was given both as to the time when Exhibit 24 was built and as to when it was tested. It is therefore our opinion that it does not corroborate Jepson's testimony of a successful reduction to practice prior to the filing date of appellees' application.

Mr. Vaillant, an engineer in charge of the testing laboratory having the function of testing models, gave the following testimony:

> "Q. 96. Mr. Vaillant, I hand you herewith a photograph which has been offered in evidence as Jepson Exhibit 25. Did you take the photograph? A. Yes, I did.
>
> "Q. 97. When did you take it? A. I would say, 10/1/48.
>
> "Q. 98. Are you sure that you took it on that date? A. That was the date.

"Q. 99. Have you ever seen the device that is photographed there? A. Yes, I have.

"Q. 100. Did you make any tests on it? A. Yes, I have. I tested that sprinkler personally on the roof. There again, we were interested in the amount of torque that was developed by the amount of pull.

"Q. 101. Is that the same sprinkler that I hand you herewith, which has been marked Jepson Exhibit 24? A. That is correct, the same sprinkler.

"Q. 102. And you tested that personally on the roof? A. Yes, I did.

"Q. 103. Did you test it anywhere else? A. No, I didn't test it anywhere else, just on the roof.

"Q. 104. What would you say of the results of the test that you made on the roof? A. We found it to be very satisfactory. If I remember right, we had much more torque with this model. As a matter of fact, I think the torque was at least twice as much, if I recall rightly."

While this testimony indicates that the photograph was taken on "10-1-48," there is no statement therein as to when the actual sprinkler, Exhibit 24, was tested. It is therefore our opinion that this testimony is insufficient to corroborate Jepson's testimony to the effect that Exhibit 24 was completely tested prior to the filing date of appellees' application.

The board found that no test records were produced by appellant with respect to Exhibit 24. In this respect the board stated:

"* * * When Ottosen turned the Exhibit 24 device over to the Testing Department (page 244 Q. 129) it would appear that this 'first model of the double drive' (page 241 Q. 100) would be subjected to the 'official testing' described above. However, no records are produced from the test report file (Cf. page 265 Q. 47 and page 267) that concern the Exhibit 24 sprinkler. Such records, Exhibits 67 to 69, were produced with respect to the earlier sprinkler shown in Exhibits 11 and 12. Those tests were made by the technician Lane (page 267 Q. 63) and Lane later made tests of the Exhibit 24 device with Kukulski on the football field (pages 182, 183); but Vaillant does not testify concerning those tests. Vaillant testifies that he himself tested the Exhibit 24 sprinkler on the roof, and 'just on the roof' (pages 273, 274 Qs. 100 to 103). He does not state when that was, and testifies as follows as to the 'results' (page 274): * * *"

The board's statement is not controverted. However, the record does show that the concern which employs Jepson is accustomed to keeping testing records. It would seem that such records should have been produced. See MacGregor v. Johnston, 71 F.2d 165, 21 C.C.P.A., Patents, 1216.

Appellant urges that no extensive testing of Exhibit 24 was required because another model having one driven member (the model which we held not to read on the counts) was extensively tested. However, it is our opinion that the testing of that other model has no bearing on the reduction to practice of Exhibit 24 since that embodiment relates to a species of the invention which is not supported by the counts.

It is our opinion, after making the foregoing analysis of the facts of this case in the light of the applicable law, that Jepson's testimony of a successful reduction to practice prior to appellees' filing date has not been adequately corroborated by the testimony of the other witnesses. In short, reviewing the board's decision, the record, and the briefs, we are of the opinion that the junior party, Jepson, has not met the burden of proving priority of invention by a preponderance of the evidence.

For the foregoing reasons, the decision of the Board of Patent Interferences is affirmed.

Affirmed.

Interference No. 86,202 (Appeal No. 6159).

Interference No. 86,202 (Appeal No. 6159) involves the Jepson application, Serial No. 126,857, filed November 12, 1949, and the Egly and Harris joint application, Serial No. 53,492, filed October 8, 1948. This interference resulted from the granting of a motion for an additional interference by Jepson in the companion interference. Jepson is the junior party.

The Egly-Harris application was partly described in conjunction with the above companion interference. However, in addition to the above-described structure, the application discloses a mechanical arrangement consisting of a lever fixed to an eccentric disk mounted on the sprinkler housing. The *disk* is in turn mechanically coupled to one of the shafts, which is driven by the water motor. By manipulating the lever, the shaft is caused to change its position for the ultimate purpose of causing the roller which is affixed to said shaft to move toward another roller for the purpose of clamping the hose therebetween.

The Jepson structure disclosed in application Serial No. 126,857, is a travelling sprinkler of the general type described in conjunction with the above companion interference. The sprinkler consists of a housing in which is mounted a horizontal shaft having two portions of worm gearing thereon. As the water motor operates suitable gearing causes the horizontal shaft to rotate. The wormed portions of the shaft are each geared to and thus rotate vertical shafts journalled in bearings. Each bearing can move in the housing. Levers are operatively positioned relative to said bearings to cause said bearings and shafts, when the levers are manipulated, to move toward and away from each other against the bias of springs. The function of the foregoing structure is to facilitate the positioning of the garden hose between the rollers by causing the rollers to move toward and away from each other.

The following four counts are in issue in this case:

"1. In a self-propelling lawn sprinkler, a movable carriage, a motor associated with said carriage and rotatable in response to the conversion of water under pressure supplied thereto through a hose or the like to mechanical motion, means for supporting said carriage, a pair of spaced vertical shafts supported by said carriage and drivingly connected to said water motor, a pair of friction drive rollers one connected to each of said shafts adapted to receive therebetween said hose, means for biasing said rollers into frictional engagement with a hose disposed therebetween whereby said sprinkler is pulled along said hose in response to operation of said motor, and water distributing means on said carriage for sprinkling an area surrounding said carriage when water under pressure is supplied to said water distributing means.

"2. For use in a self-propelling lawn sprinkler of the type comprising a movable carriage and a water motor associated therewith and rotatable in response to the conversion of water under pressure supplied thereto through a hose or the like to mechanical motion, the combination of a pair of spaced vertical shafts capable of being drivingly connected to said water motor, and a pair of friction drive rollers one connected to each of said shafts for receiving therebetween said hose, said rollers and associated shafts being movable apart when it is desired to insert said hose between said rollers.

"3. A traveling lawn sprinkler comprising a housing adapted to be connected to a flexible water conduit, a water reactance sprinkler unit rotatably mounted by said

housing, rotatable drive members actuated by said unit and adapted for frictional driving engagement with said conduit to propel said housing, and means for locking said drive members in conduit-gripping relation.

"4. A traveling lawn sprinkler comprising a housing adapted to be connected to a flexible water conduit, a water reactance sprinkler unit rotatably mounted by said housing, rotatable drive members actuated by said unit and including a pair of rotatable conduit-clamping rollers having frictional driving engagement with said conduit to propel said housing, and a plurality of spaced ground-engaging supports connected to said housing."

The board granted priority to the parties Egly and Harris.

As stated above, Jepson is the junior party. In order to obtain priority he must prove either an actual reduction to practice prior to the earliest date to which appellee may be entitled for actual or constructive reduction, Holslag v. Steinert, supra, or prior conception coupled with the exercise of reasonable diligence from just prior to the senior party's entry into the field to a later actual or constructive reduction to practice, Hull v. Davenport, supra.

The board found that there was no reasonable continuous diligence on the part of Jepson up to the time of the filing of his application on November 12, 1949. Appellant, has found no error in this holding. This aspect of the case is therefore not before us.

Appellant urges, however, that the mechanism described in the counts was successfully reduced to practice prior to appellees' filing date. Relative to counts 3 and 4 appellant relies on the actual reduction to practice of the structure of Exhibits 11 and 12, and Exhibit 24.

We discussed the structure of Exhibits 11 and 12 at great length in the above companion appeal, and were of the opinion that they did not meet the counts. Counts 3 and 4 of the present interference call for "rotatable drive members actuated by said unit." Count 1 of the companion interference calls for the same structure. For reasons given in the companion appeal, we are of the opinion that the structure of Exhibits 11 and 12 does not meet this limitation in the counts. Therefore the structure of Exhibits 11 and 12 cannot be used as a reduction to practice of counts 3 and 4.

We reviewed the evidence relative to the reduction to practice of Exhibit 24 in the companion appeal. For the same reasons given therein, we are of the opinion that appellant has not proved by a preponderance of the evidence that he actually reduced Exhibit 24 to practice prior to appellees' filing date. We therefore deem it unnecessary to discuss this subject matter again at this point.

It is to be noted that counts 3 and 4 contain certain limitations which are not present in the counts of the companion appeal. These limitations are the locking means (count 3) and the ground engaging supports (count 4). However, since we have already determined that Exhibits 11, 12, and 24 cannot be relied upon for a reduction to practice of those counts, it is unnecessary for us to determine whether those exhibits possess the aforementioned limitations.

Appellant Jepson strongly urges that Exhibit 18 clearly supports every element called for by count 2, supra, and that this exhibit was successfully reduced to practice before any date upon which the appellees can rely. Exhibit 18 is a mechanical movement which was built for Jepson for the purpose of testing certain principles of operation of a self propelled lawn sprinkler. This exhibit is not a complete travelling sprinkler, but a sub-combination of parts which allegedly could be used in such a sprinkler. It is not necessary for the purposes of this opinion to describe Exhibit 18 in great detail. It is only necessary to state that Exhibit 18 is a device adapted to be cranked by hand and re-

lates primarily to gearing for causing a single rotary motion input to positively drive two shafts having rollers affixed thereon, said rollers being adapted to clamp a hose therebetween. It is to be noted that Exhibit 18 does not have the structure recited in the preamble of count 2, nor does it possess the water motor or certain other parts necessary for a complete travelling sprinkler.

Appellant strongly urges that count 2 is not directed to a travelling lawn sprinkler but "to a mechanical movement or mechanism which is capable of being used in a travelling lawn sprinkler of the type having a water motor," and that the preamble of count 2 is not a limitation of the count. Appellant then in essence concludes that the Exhibit 18 mechanical movement constitutes a reduction to practice of count 2.

It is our opinion that appellants' argument is not sound. In Kropa v. Robie, supra [187 F.2d 151], we made an exhaustive analysis of the effect of the preamble on claims or counts. In the course of our opinion, we stated:

> "* * * This court has often had before it the Jepson problem (243 O.G. 525-1917)—whether the preamble to claims in *ex parte* cases or to the counts in interference cases should be considered as limitations in the claims or counts. Of the thirty-seven cases of this court we have reviewed with respect to this problem it appears that the preamble has been denied the effect of a limitation where the claim or count was drawn to a structure and the portion of the claim following the preamble was a self-contained description of the structure not depending for completeness upon the introductory clause; * * *. In those cases, the claim or count apart from the introductory clause completely defined the subject matter, and the preamble merely stated a purpose or intended use of that subject matter. On the other hand, in those *ex parte* and interference cases where the preamble to the claim or count was expressly or by necessary implication given the effect of a limitation, the introductory phrase was deemed essential to point out the invention defined by the claim or count. In the latter class of cases, the preamble was considered necessary to give life, meaning and vitality to the claims or counts. Usually, in those cases, there inhered in the article specified in the preamble a problem which transcended that before prior artisans and the solution of which was not conceived by or known to them. * * *"

An analysis of count 2 shows that the portion of the count following the preamble is not a self-contained description of structure not depending for completeness upon the introductory clause. More specifically, the body of count 2, by reciting the water motor, relies for completeness on the preamble of the count. Furthermore, it is our opinion in the present case that the preamble to count 2 is essential to point out the invention defined by the count, and is necessary to give life, meaning, and vitality to the count. It can readily be seen that if the preamble and the reference to the water motor are deleted from the count, there is very little left to the count. Thus it is our opinion that count 2 does not merely recite a mechanical movement subcombination, but is directed to a self-propelling lawn sprinkler.

Since count 2, in our opinion, is directed to a travelling lawn sprinkler, and since Exhibit 18 is but a mechanical movement, we are of the opinion that Exhibit 18 cannot constitute a reduction to practice of count 2 since it is not directed to the same device recited in the count. This being the case, it is unnecessary to review the evidence which has been submitted of proving a reduction to practice of Exhibit 18.

Appellant urges that a successful reduction to practice of count 2 effectively amounts to a successful reduction of

count 1 of this interference. In essence, appellant states that since Exhibit 18, which is but a mechanical movement, was reduced to practice, it must serve as a reduction to practice of count 1 which is directed to a travelling sprinkler because it was obvious that Exhibit 18 could be driven by the water motor of a travelling sprinkler so that no testing of a device such as recited in count 1 was required. We have already determined, in connection with count 2, that the mechanical movement of Exhibit 18 and a travelling sprinkler do not relate to the same device. Furthermore, appellant's argument that the reduction to practice of Exhibit 18 constitutes a reduction to practice of count 1 seems to be refuted by the facts of the case. The following testimony was given by Mr. Jepson on his cross-examination:

> "* * * Did you ever make a model incorporating the mechanism of Exhibit 18 as mounted on wheels separate from the rollers, as illustrated in the patent application 126857?
>
> "Mr. Wyss: He has already answered by saying he did not.
>
> "A. I believe I did answer that. We did not. It looked too complicated. That is why I went back to this other type of—
>
> "Mr. Knoblock: For the record, I wanted it repeated. That is all."

It would appear that if the inventor himself thought it was too complicated to incorporate Exhibit 18 into a travelling sprinkler, it cannot now be urged that the building of Exhibit 18 constituted a reduction to practice of the travelling sprinkler.

We therefore cannot subscribe to appellant's argument, and we hold that Exhibit 18 does not constitute a reduction to practice of count 1.

It is to be noted that appellant did not include in the record appellees' Exhibit 42, an article which was published in a magazine. The exhibit was added on stipulation of the parties to correct diminution of the record, said stipulation having been instigated by appellees. This added matter was not necessary for a proper decision in this case, and costs for making such addition are therefore assessed against appellees.

We have carefully reviewed the record of this case, the briefs, and the board's exhaustive and complete decision. However, we are of the opinion that appellant as junior party has not proved by a preponderance of the evidence that he was the first inventor.

For the foregoing reasons, the decisions appealed from are affirmed.

Affirmed.

JACKSON, Judge, retired, recalled to participate.

O'CONNELL, Acting Chief Judge, and COLE, Judge, were present at the argument of this case, but, by reason of illness, did not participate in the decision.