*30 C.C.P.A. (Patents)*

### TRAVIS v. BAKER et al.

Patent Appeal No. 4714.

Court of Customs and Patent Appeals.

July 6, 1943.

Harry G. Grover and James G. Norton, both of New York City (Abraham S. Greenberg, of New York City, of counsel), for appellant.

Irvin S. Thompson, of Washington, D. C. (Ralph B. Stewart, of Washington, D. C., of counsel), for appellees.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal in an interference proceeding from the decision of the Board of Appeals of the United States Patent Office reversing the decision of the Examiner of Interferences awarding priority of invention of the subject matter defined in the three counts in issue to appellant, Charles Travis.

The interference is between appellant's application No. 19,563, filed May 3, 1935, and appellees' application No. 30,238, filed July 8, 1935.

110

■ Appellees being the junior party, the burden was upon them to establish priority of invention by a preponderance of the evidence.

■ Appellant submitted no evidence, and is confined to his filing date (May 3, 1935) for conception of the invention and its constructive reduction to practice.

Appellees rely on provisional specifications Nos. 21775/34 (filed July 25, 1934) and 34831/34 (filed December 4, 1934), accompanying a British patent application, for conception and constructive reduction to practice of the involved invention, and particularly on their provisional application, filed December 4, 1934, for the specific type of tune adjuster called for by the counts in issue.

The counts originated in appellant's application.

The invention relates to the automatic tuning of a radio receiver, such as a superheterodyne receiver, by means of a discriminator network or error detector, and a tune adjuster, and, for the purpose of this decision, is sufficiently defined in count 1 which reads:

"1. A superheterodyne receiver comprising a frequency changer network including a tunable local oscillator circuit, an intermediate frequency network, means for demodulating the intermediate frequency energy, a discriminator network, connected to the intermediate network, to have intermediate frequency energy impressed thereon, constructed and arranged to produce a direct current voltage whose magnitude is solely dependent upon the frequency of said impressed energy, an electron discharge tube including at least an output electrode and a pair of input electrodes and having its output electrode connected to the oscillator circuit, an impedance coupled to the oscillator circuit across which is developed an alternating voltage substantially in quadrature with the output electrode [alternating current] of said electron discharge tube, means for impressing said last voltage upon the input electrodes of said tube, and means for impressing the direct current voltage produced by said discriminator upon an input electrode of said tube whereby the frequency of said local oscillator circuit may be adjusted in a predetermined direction, and said impedance being a condenser whereby said tube reflects a negative inductance across the oscillator circuit."

Count 1 is the only count which calls for the discriminator network. As stated in the count, the discriminator network is connected to the intermediate network to "have intermediate frequency energy impressed thereon," and is so constructed and arranged as to "produce a direct current voltage whose magnitude is solely dependent upon the frequency of said impressed energy." The specific tune adjuster is described in that count as "an electron discharge tube including at least an output electrode and a pair of input electrodes and having its output electrode connected to the oscillator circuit, *an impedance coupled to the oscillator circuit across which is developed an alternating voltage substantially in quadrature with the output electrode [alternating current] of said electron discharge tube.*" (Italics not quoted.) That count also calls for "means for impressing said last voltage [the alternating voltage which is substantially in quadrature with the output electrode of the discharge tube] upon the input electrodes of said tube, and means for impressing the direct current voltage produced by said discriminator [the discriminator network] upon an input electrode of said tube whereby the frequency of said local oscillator circuit may be adjusted in a predetermined direction, and said impedance [the impedance, hereinbefore referred to, coupled to the oscillator circuit] being a condenser whereby said tube reflects a negative inductance across the oscillator circuit."

As hereinbefore noted, counts 2 and 3 do not specifically include a discriminator network. All of the counts, however, call for a tune adjuster which automatically varies the frequency of a local oscillator. The frequency of the local oscillator is varied by means of an impedance coupled to the oscillator circuit, which, as stated by the Examiner of Interferences, "develops a phase quadrature voltage which is applied to the grid of a reactance tube that is also connected to the oscillator circuit."

There are no questions of law presented by this appeal, and the only issue before us is one of fact.

Precisely, the issue, as stated in the brief of counsel for appellant, is: "Does the British Provisional Specification No. 34,831 of December 4, 1934, involve teachings such that, when followed by one skilled in the art at the time of its filing, a successfully operative circuit supporting all

the limitations of the counts will inevitably result?"

■ It appears from the record that appellees' provisional specifications, hereinbefore referred to, were not accompanied by drawings. However, the fact that they were not is not of vital importance. See Goldsmith v. Von Mihaly, 90 F.2d 359, 24 C.C.P.A., Patents, 1239.

■ In order to comply with the doctrine of constructive reduction to practice, a provisional specification must be for the same invention as that defined in the count in an interference, and it must contain a disclosure of the invention sufficiently adequate to enable one skilled in the art to practice the invention defined by the count, with all the limitations contained in the count, without the exercise of the inventive faculties. Curtis v. Lindmark, 37 App. D.C. 322; Nelson v. Wolf et al., 97 F.2d 632, 25 C.C.P.A., Patents, 1290.

It appears from the decision of the Examiner of Interferences that, at the time the cause was submitted to him, counsel for appellees submitted a drawing, which, it was contended, disclosed "a circuit" which conformed to the disclosure contained in appellees' provisional specification No. 34831/34, filed December 4, 1934, and also to the counts in issue. The examiner was of opinion that, although the "circuit" disclosed in that drawing could be "spelled out" of the disclosure in the provisional specification, other and quite different circuits could also be "spelled out" of the provisional specification, and that, therefore, the provisional specification was not sufficiently definite to enable one skilled in the art, following the teachings contained therein, to produce "the circuit" defined by the counts in issue.

The examiner held that "the circuit" disclosed in the drawing submitted to him by counsel for appellees was inoperative. In this connection, he said: "* * * This circuit shows a grid of the oscillator tube connected through a grid link 8 and condenser 7 directly to the anode tube of the pentode. Consequently the grid 9 of the oscillator portion of the frequency charger is at a high positive potential which would produce an inoperative circuit which would fail in operation."

In referring to the feature in each of the counts for phase quadrature relation between the alternating voltages on the output and input electrodes of the frequency control tube, the Examiner of Interferences referred to the fact that, although in appellees' provisional specification it was stated that care should be "taken that the phase angle between the anode and grid volts of the pentode does not greatly depart from 90°," appellees' "specific disclosure of circuit and values leads in a contrary direction. The potentiometer is stated to consist of a high resistance * * * and a small capacity * * *. If the capacity * * * is to be small it must of necessity have a high capacitative reactance and hence the impedance across the total potentiometer will not be substantially purely resistive as is required to have a phase quadrature relationship."

The examiner further stated that in the circuit in appellees' drawing the condenser was "connected in series with the potentiometers * * * by the cathode * * * and anode * * * of the pentode"; that this "condenser would increase the departure of the impedance from a purely resistive component between these elements of the reactance tube and an even further departure from phase quadrature relation would be obtained by such a setup"; and that, therefore, appellees' provisional specification did not constitute a constructive reduction to practice of the invention defined by the involved counts.

The Board of Appeals disagreed with the views expressed by the Examiner of Interferences, and held that appellees' disclosure in their provisional specification contained all of the elements of the involved counts.

It appears from the board's decision that counsel for appellees submitted a series of drawings, which, it was held, conform to the counts in issue and to the disclosure in appellees' provisional specification. Figure 9 of those drawings, the board stated, disclosed the various elements of the counts, assembled in proper relation to each other. In its decision, the board pointed out that the drawings presented to the Examiner of Interferences were wrong in two particulars. (Those errors will be hereinafter more particularly referred to.)

In its decision, the board discussed each of the criticisms made by the Examiner of Interferences relative to the disclosure in appellees' provisional specification, called attention to the fact that that specification disclosed the discriminator network called for by count 1, and, referring to the statement of the examiner that the provisional

specification was vague as to how the oscillator circuits were to be "connected to the diode rectifier," stated that it found nothing in count 1 that required that the oscillator circuits be connected to the diode rectifier; that the diode rectifier was an element of the discriminator network; that count 1 required that the discriminator network be connected to the intermediate network to have, as stated in that count, "intermediate frequency energy impressed thereon"; and that the discriminator network was, as stated in the count, so constructed and arranged as to produce a "direct current voltage whose magnitude is solely dependent upon the frequency of said impressed energy." The board further stated that the manner in which that arrangement was disclosed in appellees' provisional specification was described in the following language:

"* * * The anode circuit of the last intermediate frequency stage besides including a closed oscillatory circuit coupled with the detector may include two inductances respectively coupled through an earthed screen with closed oscillatory circuits tuned respectively above and below intermediate frequency. These are joined on the one hand to the anodes of a double diode rectifier and on the other hand through condenser-shunted resistances with its common cathode, the diode being designed, for example by wide separation of its anode leads, to produce as little coupling as possible between the circuits. The rectified voltages generated in these resistances are opposed, and their algebraic sum is applied through suitable de-coupling resistances (or inductances as below explained) and capacities to the grid of a pentode which is to act as a variable impedance.

"The need for a resistance or choke in the anode supply circuit of this valve may be partly or wholly obviated by using for this purpose the inductance of the oscillatory circuit of which the tune is to be corrected. This inductance is connected on the one side with the anode and on the other with the high tension supply and through a condenser with the cathode. The variable capacity of the tuned circuit is connected between anode and cathode."

The board then stated that counsel for appellees admitted an error in the drawings submitted to the Examiner of Interferences, and that that error had occurred because counsel had overlooked the word "respectively" in the first sentence of the foregoing quotation. The board also stated that the drawings submitted to the Examiner of Interferences were admittedly inaccurate in another respect in that they disclosed the "condenser through which the anode of the pentode tube is connected to the grid of the triode in the triode-pentode as shunted by a grid leak"; that a "grid leak" of that type in the circuit would, as held by the Examiner of Interferences, render the circuit inoperative; that the mistake thus made in the drawings was brought about by following literally the language of the provisional specification, but that it would be understood by one skilled in the art that where a coupling was to be made between the anode of one tube and the grid of another through a condenser, the condenser "should not be shunted by a grid leak but that the grid connection should be made directly to the cathode as appellants [appellees here] have now shown it."

In other words, as we understand it, it was the view of the Board of Appeals that, although a mistake was made in the provisional specification in respect to the matters hereinbefore stated, that mistake would be obvious to one skilled in the art, who was attempting to construct the circuit disclosed in the provisional specification, and he would proceed to make the coupling in the manner stated by the board.

With reference to the phase quadrature relation, hereinbefore referred to, the board stated that that feature of the counts was disclosed in the following provisions of appellees' provisional specification:

"* * * by suitably adjusting the phase between grid and anode voltage the apparent anode impedance of the valve may be made resistive, capacitive, or inductive or complex.

"The desired fraction of the anode voltage with the desired modification of phase may be obtained in one step by connecting a resistance-reactive potentiometer between anode and cathode and joining its tapping to the grid, or such a potentiometer may be fed from the anode circuit through a suitable transformer.

* * * * *

"* * * by suitable choice of the impedances any desired reactance may be obtained—a sort of inverted Miller effect; for example if $Z_1 + Z_2$ is mainly resistive and $Z_2$ a capacity, the effective impedance from anode to grid will be a negative inductance.

* * * * *

"For the purpose of varying the effective impedance of the pentode a potentiometer consisting of a high resistance and small capacity, is supplied from the anode circuit of the pentode and the junction of the resistance and capacity is connected with the control grid of the pentode.

\* \* \* \* \*

"\* \* \* care being taken that the phase angle between the anode and grid volts of the pentode does not greatly depart from 90°."

With reference to the holding of the Examiner of Interferences that the disclosure in appellees' provisional specification of a high resistance and a small capacity would not produce the phase quadrature relation required by each of the counts, the board stated that in appellees' provisional specification the proper relationship between resistance and reactance to obtain the results desired was disclosed in considerable detail, and that "The term 'small capacity' does not appear to us to be necessarily inconsistent. Obviously a capacity such as is normally used for by-passing radio-frequency or audio-frequency currents would not be used as it would have insufficient impedance for the purpose of the potentiometer described. The proper capacity to use is admittedly of much smaller order than the capacities above discussed and might well have been referred to by the term 'small.' *We do not feel that there is anything necessarily inconsistent about the provisional specification and that, when interpreted by one skilled in the art, it would necessarily result in an arrangement such as is illustrated in Figs. 8 and 9 of the sketches accompanying appellants'* [appellees here] *brief.* [Such arrangement conforms to the counts in issue.]" (Italics not quoted.)

After replying in considerable detail to other highly technical arguments made by counsel for appellant Travis, which we deem it unnecessary to discuss here, the board concluded that appellees' provisional specification disclosed the subject matter of the involved counts in such sufficiently definite and clear manner as to enable one skilled in the art to "inevitably" produce the circuit defined by the counts in issue, and that as the filing date of appellees' provisional specification No. 34831/34 (December 4, 1934) was prior to the filing date of appellant's involved application, appellees were entitled to an award of priority of invention.

Counsel for appellant here contend that the Examiner of Interferences was right in holding, for the reasons stated in his decision, that appellees' provisional specification does not disclose the involved invention, and that, therefore, appellant is entitled to an award of priority of invention. Counsel vigorously attack the decision of the Board of Appeals on practically every issue decided by it.

As will be observed from what has been said, the subject matter of the involved counts is highly technical in character.

The Board of Appeals has exhaustively discussed all of the issues presented here by counsel for appellant, and has pointed out wherein appellees' provisional specification discloses the various limitations contained in the counts. It may be added that had counsel for appellees presented to the Examiner of Interferences correct drawings of the disclosure contained in appellees' provisional specification, the examiner might have reached a different conclusion. Be that as it may however, we are of opinion that the Board of Appeals reached the right conclusion, and its decision is, accordingly, affirmed.

Affirmed.

LENROOT, Associate Judge, took no part in the consideration or decision of this case.